**LEVI & KORSINSKY, LLP**
Donald J. Enright
1101 30th Street NW
Suite 115
Washington, DC 20007
Tel.: (202) 524-4292
Fax: (202) 333-2121
Email: denright@zlk.com

*Attorneys for Plaintiff Joseph J. Klapper, Jr.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSEPH J. KLAPPER, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RIOT BLOCKCHAIN, INC. F/K/A, BIOPTIX, INC., JOHN O'ROURKE, and JEFFREY G. MCGONEGAL,<br><br>Defendants. | Case No. 3:18-cv-8031<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

This action is brought against Defendants Riot Blockchain, Inc. f/k/a Bioptix, Inc. ("Riot" or the "Company"), John O'Rourke ("O'Rourke"), Jeffrey G. McGonegal ("McGonegal, and collectively with Riot and O'Rourke, the "Defendants"). Plaintiff Joseph J. Klapper, Jr. ("Plaintiff"), by his attorneys, except

for her own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Riot, as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.  This is a federa1 securities class action on behalf of all investors who purchased or otherwise acquired the Company's publicly traded securities between November 13, 2017, and February 15, 2018, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.  This action is brought on behalf of the Class for violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

3.  Riot purports to build and support various blockchain technologies and invest primarily in the Bitcoin and Ethereum blockchains.

4. The Company made materially false and/or misleading statements, misrepresenting, *inter alia*, its involvement with blockchain technologies, location, annual shareholder meeting, and relationships with company insiders.

5. As the truth was revealed, in stages, the price of Riot stock: (i) declined from $31.22 per share on December 26, 2017, to close at $27.23 per share on December 28, 2017 (a drop of approximately 13% over two trading days); (ii) declined from $24.43 per share on January 5, 2018, to $20.85 per share on January 11, 2018 (a decline of $3.58 per share, or nearly 15% over four trading days); and (iii) declined from $17.2 per share on February 16, 2018, to close at $11.46 per share (a decline of $5.74 per share, or approximately 33%).

## JURISDICTION AND VENUE

6. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications, and the facilities of the NASDAQ (a national securities exchange located in this District).

8.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act.

## PARTIES

9.    Plaintiff purchased Riot securities as set forth herein and in his certification filed herewith. Plaintiff's certification evidencing his transactions is attached hereto as Exhibit 1.

10.    Riot is a corporation which purportedly maintains its principal executive offices at 834-F South Perry Street, Suite 443, Castle Rock, CO 80104. Riot securities trade on NASDAQ under the symbol "RIOT."

11.    Defendant O'Rourke has been the Company's Chief Executive Officer ("CEO") and Chairman of the Board since November 3, 2017.

12.    Defendant McGonegal has been the Company's Chief Financial Officer ("CFO") since June 30, 2017.

13.    Defendants in Paragraphs 11-12 are collectively referred to herein as the "Individual Defendants."

14.    Each of the Individual Defendants:

   a) directly participated in the management of the Company;

   b) was directly involved in the day-to-day operations of the Company at the highest levels;

c) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

d) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

e) was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

f) approved or ratified these statements in violation of the federal securities laws.

15.    Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Riot's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

16.    As officers of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States,

the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Riot's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or

misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.    Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Riot's securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Riot's business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other shareholders to purchase Riot securities at artificially inflated prices.

## **CONTROL PERSON ALLEGATIONS**

19.    By reason of the Individual Defendants' positions with the Company as executive officers the Individual Defendants possessed the power and authority to control the contents of Riot's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the

Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### I.    Company Background

20.    Since October 2017, Riot has styled itself as a blockchain technology company.  Before that time, Riot was a biotechnology company known as Bioptix that specialized in the development of veterinary and life science diagnostic tools. As Bioptix, the Company focused on animal healthcare and veterinary products.  As Riot, the Company now purports to focus on blockchain technologies and investments.

### II.    Material Misstatements and Omissions during the Class Period

21.    On October 4, 2017, Bioptix issued a press release stating that it was changing its name to Riot Blockchain, Inc. and shifting its business focus to investing in and operating blockchain technologies with a particular focus on Bitcoin and Ethereum.  The Company had previously operated in the biotechnology sphere, and had no previous business in blockchain technologies.  Regardless of this fact, the press release portrayed Riot as a seasoned player in an exciting emerging technology.  For example, CEO Beeghley was quoted in the press release as stating,

"'At Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets.'"

22.    Over the following months, Riot made various announcements regarding its ever-increasing involvement in blockchain investments. For example, on November 2, 2017, Riot issued a press release announcing that it had entered into an agreement to acquire 1,200 Bitcoin mining machine.

23.    On November 13, 2017, Riot filed its quarterly report on Form 10-Q for the period ended September 30, 2017 (the "3Q17 10-Q") with the SEC, which provided the Company's quarterly financial results and position. The 3Q17 10-Q was signed by Defendants O'Rourke and McGonegal. The 3Q17 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants O'Rourke and McGonegal attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

24.    The 3Q17 10-Q stated that the Company's principle executive offices were located at 202 6th Street, Suite 401, Castle Rock, CO 80104.

25.    On December 27, 2017, the Company issued a press release entitled "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders" which announced the cancelation of the annual meeting of stockholders scheduled for the following day. The press release stated in relevant part:

Annual Meeting to Resume on Thursday, February 1, 2018

CASTLE ROCK, Colo., Dec. 27, 2017 /PRNewswire/ -- Riot Blockchain, Inc.

(Nasdaq: RIOT) (the "Company") today announced that its 2017 Annual Meeting of Stockholders scheduled for December 28, 2017 (the "Annual Meeting"), was adjourned to achieve a quorum on the proposals to be approved.

The Annual Meeting has been adjourned to 10:00 a.m. Eastern Standard Time on Thursday, February 1, 2018, at the Boca Raton Resort and Club, 501 East Camino Real, Boca Raton, FL 33422, to allow additional time for the Company's stockholders to vote on proposals to approve the following:

1. To elect as directors the nominees named in the proxy statement;

2. To ratify the appointment of EisnerAmper LLP as our independent public accountant for the fiscal year ending December 31, 2017;

3. To advise us as to whether you approve the compensation of our named executive officers (Say-on-Pay); and

4. To approve an amendment to the Company's 2017 Equity Incentive Plan to increase the reservation of common stock for issuance thereunder to 1,645,000 shares from 895,000 shares.

During the period of the adjournment, the Company will continue to solicit proxies from its stockholders with respect to the proposals set forth in the proxy statement. Only stockholders of record on the record date of December 11, 2017, are entitled to and are being requested to vote. If a stockholder has previously submitted its proxy card and does not wish to change its vote, no further action is required by such stockholder.

No changes have been made in the proposals to be voted on by stockholders at the Annual Meeting. The Company's proxy statement and any other materials filed by the Company with the SEC remain unchanged and can be obtained free of charge at the SEC's website at www.sec.gov.

The Company encourages all stockholders that have not yet voted to vote their shares by 11:59 p.m. on Wednesday, January 31, 2018, Eastern Standard Time. If you have not voted, or have mislaid your proxy materials or are uncertain if you have voted all the shares you are

entitled to vote please see "How You Can Vote" in the proxy materials. Every single vote counts.

26.    On January 31, 2018, the Company issued another press release entitled "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders" which again announced the cancelation of the annual meeting of stockholders scheduled for the following day. The press release stated in relevant part:

> CASTLE ROCK, Colo., Jan. 31, 2018 /PRNewswire/ -- Riot Blockchain, Inc.
>
> (Nasdaq: RIOT) (the "Company") today announced that its 2017 Annual Meeting of Stockholders (the "Annual Meeting") was adjourned for a second time to achieve a quorum on the proposals to be approved. Under Nevada law, a new record date is required to be set.
>
> The Company will file and mail a new proxy statement to its shareholders of record as soon as practical after its Board of Directors approves the new record date and schedules a new date and time for its Annual Meeting.

27.    The statements references in ¶¶ 24–26 above were materially false and/or misleading because Defendants had no intention of holding the annual shareholder meeting at all.  On news of this first adjournment, the Company's stock declined from $31.22 per share on December 26, 2017, to close at $27.23 per share on December 28, 2017, a decline of nearly 13% over two trading days.

28.    On January 5, 2018, the Company filed a notification on Form 8-K revealing that it had dismissed its auditor, EisnerAmper LLP. On January 9, 2018, investor news site *The Motley Fool* published an article entitled "Riot Blockchain: This Crypto Clown Car Continues Hurtling Toward the Abyss." The article publicized the auditor's dismissal and connected it to the removal of two other

auditors by Riot earlier in the year, which raised concerns about corporate governance and the legitimacy of the Company's business. On this news, the price of Riot shares once again declined, from a close of $24.43 per share on January 5, 2018 to a close of $20.85 per share on January 11, 2018, a decline of $3.58 per share, or nearly 15%, over four trading days.

29. On February 16, 2017, CNBC published the article "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket" regarding questionable practices at Riot, stating in relevant part:

> As bitcoin hit record highs in late December, a hot new stock was making news
> on a daily basis. Riot Blockchain's stock shot from $8 a share to more than $40, as investors wanted to cash in on the craze of all things crypto.
>
> **But Riot had not been in the cryptobusiness for long. Until October, its name was Bioptix, and it was known for having a veterinary products patent and developing new ways to test for disease.**
>
> That might sound somewhat like the type of newly minted blockchain company that has gained SEC attention.
>
> **"Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain," SEC Chairman Jay Clayton said, speaking in generalities in recent testimony to Congress. The SEC declined to comment to CNBC about Riot Blockchain.**
>
> The company did make an investment in a cryptocurrency exchange in September and two months later did purchase a company that has cryptocurrency mining equipment, but paying more than $11 million for equipment worth only $2 million, according to SEC filings.

That purchase and the company's name change aren't Riot's only questionable moves. *A number of red flags in the company's SEC filings also might make investors leery: annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors, SEC filings that are often Byzantine and, just this week, evidence that a major shareholder was getting out while everyone else was getting in.*

\*          \*          \*

*Despite Riot Blockchain's latest quarterly report showing a company in the red, its annual meeting was twice set to take place at the swanky Boca Raton Resort and Club in Florida.* The resort is known as the "pink palace" and has luxury yachts lined up on its dock.

*But with less than one day's notice, Riot twice "adjourned" its annual meeting, first scheduled for Dec. 28 and then for Feb. 1. It's not clear the company ever planned to have the meeting. Numerous employees at the hotel told CNBC it had no reservations for either date under the name of Riot Blockchain or any affiliated entity*.

Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain.

*That would explain why a company formerly headquartered in Colorado might suddenly host its annual meeting in Boca Raton. That sunny location would certainly be convenient for Honig, once the company's largest shareholder, whose office is a short drive from the hotel. He once owned more than 11 percent of the outstanding common stock, according to SEC filings.*

"My history of investing's pretty good. I invest in public companies," Honig told CNBC by phone. "It was an investment where I had a return. And I sold some shares. There's nothing wrong with doing that."

Honig became active in Riot in April 2016 when it was a veterinary testing company with a different name. He led an activist campaign to replace the board in September 2016 and won the fight in January 2017.

After his victory, attorneys say, red flags began to appear.

Until January, Honig had an extensive website filled with fawning descriptions of his investment acumen and what he does for companies when he gets involved.

"Barry Honig's investment portfolio includes a variety of exciting technology and biotech companies focused on innovation and progress," barryhonig.com stated before it was taken down.

"Typically, Barry Honig invests his hard-earned money into a company, and he
also provides strategic guidance to the company pertaining [sic] a variety of aspects, including who should lead the company (he helps put the right people in the right places in most of his investments), what goals and timelines that company should work towards, and a plan for the best way to achieve those goals," the website said.

A visit to the site now only reveals the text: "Under construction."

From the outside, Honig's office is nondescript. There does not appear to be any evidence of his company's existence on the building's directory or on the door of his office.

**When CNBC crew members walked into the office, they didn't find Honig, they found O'Rourke.** That's the same O'Rourke who made headlines when — less than three months after the company changed names and business plans — he sold about $869,000 worth of shares, according to an SEC filing. He told the crew he was there for a meeting with Honig and that we had just missed him.

O'Rourke initially agreed to a formal interview with CNBC and emailed later to say the interview was "confirmed," adding "I think you'll be impressed." Then, late the night before, he backed out via email and said he needed to go to the Midwest to close an acquisition.

He agreed to answer questions via email instead. One of CNBC's first questions was whether he worked in the same office as Honig, which could raise eyebrows.

"I have my own office in a separate location," O'Rourke said in an email sent by his lawyer, Nick Morgan, a partner with Paul Hastings. "I do have a good relationship with Mr. Honig and we speak often."

"John O'Rourke does not work out of my office," Honig said. "John O'Rourke has his own office ... at one time John O'Rourke had space in my office ... we speak often."

*Securities attorneys told CNBC that if a CEO were using the office of a major investor, it might raise concerns about the exchange of information.*

*"You just can't imagine that the CEO and the investor are going to have an appropriate wall between them where they're not engaging in discussions or dialogue about what's appropriate for the company on a day to day basis or in the future," said Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP.*

Despite Honig's website saying he gives advice on who should lead a company,
Honig said he had nothing to do with O'Rourke becoming CEO.

"The board and Michael Beeghley [the CEO before O'Rourke] are the ones that made the decision in regards to John O'Rourke becoming the CEO, okay? John O'Rourke doesn't work for me, okay?" he said.

Birns analyzed Riot Blockchain's SEC filings for CNBC and found additional concerns.

*"I see a company that has had a change of control of the board. I see a company that has had a change in business. I see a company that has had several dilutive issuances immediately following the change of the board and change of the business. And I see a stock that has gone zoom," he said. "And what I understand a significant amount of insider selling. So yes, these are red flags."*

15

Jacob Zamansky, founder of Zamansky LLC, which specializes in securities fraud, also expressed caution.

"With the absence of revenue on the company's current financial statements, I would think investors need to be very cautious of a highly speculative stock with a lot of red flags," he said.

Since Honig's board shake-up, the company has increased its common stock share count from 4.5 million to more than 11.6 million. On Oct. 2, 2017, two days before announcing the name change to Riot Blockchain, the board approved a dividend payout of more than $9.5 million, according to SEC filings.

Investors who own more than 5 percent of a company's outstanding common stock are required to file a form known as a 13D, which outlines their holdings.
Subsequent changes in holdings require a "timely" filing of any changes.

SEC records spanning 14 months show that Honig filed two 13Ds, including one in January 2017 that shows he owned 11.19 percent. After Riot's name change sent the company's shares soaring, Honig cashed out and filed the second 13D in February showing he owned less than 2 percent of outstanding common stock along with a small number of warrants. His purchase price ranged from $2.77 to
$5.32 per share, according to the list of trades he provided to the SEC in 2017. Honig's investment dropped below 5 percent, the threshold for SEC filing, on Nov. 28. At that point, the stock had already climbed above $20.

Honig did not disclose his dramatically reduced position in the stock until this week.

***But that may not be the true extent of Honig's selling. Buried deep in the
footnotes of Riot filings, it's clear Honig also accumulated more than 700,000 new warrants that he could convert to stock at $3.56 per share and more than 700,000 promissory notes that he could convert to stock at $2.50 a share.***

*What about those warrants and promissory notes? It's not clear, as he never mentioned them in either 13D. But in another footnote from a recent Riot filing, there is no longer a mention of them.*

He declined to further clarify what happened to them.

"It's all disclosed in the public filings. And those are all the obligations I have," he said. "I'm very comfortable with what I had to do and what I was obligated to do. ... I'm not going to talk about my personal trading history or my bank account."

*Birns questioned how Honig made his filings. "It's clear that Mr. Honig, through himself and through the entities that he controls, owns at least a significant amount of stock. Or has the potential to own significant amount of stock in excess of what is reported on the 13D," he said.*

This is not the first time Honig has faced questions over his actions. In 2000, he was alleged to have committed stock manipulation. Honig was fined $25,000 and suspended for 10 days, according to the Financial Industry Regulatory Authority. In 2003, he let his broker's license lapse.

"The answer's no," Honig said when asked if he still manipulates stocks.

SEC filings suggest that when Honig began his charge to take over the board, he was represented by lawyer Harvey Kesner of Sichenzia Ross Ference Kesner LLP. A few months later, Kesner's law firm appears on Riot Blockchain's SEC filings.

Kesner's company, Paradox Capital Partners LLC, owns Riot stock, according to
SEC filings.

When reached by phone, Kesner said he didn't know anything about Riot
Blockchain and Barry Honig and hung up.

Honig said Kesner was Riot's attorney, but "his law firm has represented me in other issues in the past."

17

Since its name change, Riot has been a very active company, issuing 23 press releases about acquisitions and new divisions.

One of those acquisitions was Kairos Global Technology Inc., which had been founded less than two weeks before the purchase. Kairos' main asset was $2 million of mining equipment. Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings.

O'Rourke told CNBC the company paid a premium for the equipment due to a shortage of mining equipment and difficulties getting it directly from the manufacturer.

Kairos appears to have many links to Riot. The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company.

Laxague told CNBC he could not comment when reached by phone and hung up.

Kairos' president was Michael Ho, Nevada records show, a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC.

O'Rourke said Riot is using the equipment to mine and that the company is currently mining in Norway and Canada. Despite the many press releases, there has been no formal mining announcement.

"We have launched our own Bitcoin mining operation and it will be a focal point for Riot's expansion plans moving forward," is all Riot says on its webpage dedicated to mining. SEC filings are silent on mining activity.

As for professional poker players advising Riot? O'Rourke told CNBC the players are investors in the cryptocurrency space with more than 50,000 social

media followers. He called them "thought leaders."

***Riot is not O'Rourke and Honig's first cryptocurrency investment.***

In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is
now a cloud-services-for-cars company.
O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor. "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said. "I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."

Honig acknowledges the investment.

The questions continue for Riot Blockchain.

On Tuesday, Riot filed to withdraw prior SEC filings.
"It is not the result of any government inquiry," O'Rourke said in an email. "It was just corporate clean up from our securities counsel."

As for the annual shareholders' meeting, "We did not have a quorum of shareholders required for a vote," O'Rourke said in the email from his lawyer. "We are also working on other corporate action items that would require shareholder approval and a shareholder meeting as well. We did not want to waste the time and expense of potentially having two shareholder meetings within a short period of time. Thus we adjourned the meetings, which is not an uncommon practice."

There is no new date for the shareholders' meeting.

"You see companies adjourn meetings in a context of a contested election and the like," Birns said. "I just don't think in this instance, there's any reason to adjourn their annual meeting."
And as to O'Rourke selling stock in December?

He told CNBC in the email: "I sold less than 10 percent of my overall position to
assist with covering tax obligations as a result of so-called phantom income tax from the vesting of restricted stock awards. It is common for Executives to sell stock to cover such tax obligations. I could have sold more stock in that window but chose to sell just 30,383 shares."

O'Rourke welcomes increased regulation and transparency for the cryptocurrency industry. "Unfortunately, as with many new hot sectors, it [blockchain] has attracted some bad actors trying to capitalize on the hype," he said. "Riot is all for increased transparency and properly imposed regulation."
Honig would not disclose how much he made on his investment in Riot, "I wasn't fortunate enough to do as well as you might think and people might speculate. ... I don't regret anything." (Emphasis added).

30.    On this news, shares of Riot fell $5.74 per share or over 33.37% to close at $11.46 per share on February 16, 2018, damaging investors.

31.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

32.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly

and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Riot, their control over, and/or receipt and/or modification of Riot's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Riot, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

33.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Riot's securities and operated as a fraud or deceit on Class Period purchasers of Riot securities by materially misleading the investing public. Later, as Defendants' prior misrepresentations and fraudulent conduct was unraveled in stages to the market, the price of Riot's securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Riot securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

34.    At all relevant times, the market for Riot's securities was an efficient

market for the following reasons, among others:

a)    Riot common stock met the requirements for listing, and was listed and

actively traded on NASDAQ, a highly efficient and automated market;

b)    Riot filed periodic public reports with the SEC and NASDAQ; and

c)    Riot regularly communicated with public investors via established

market communication mechanisms, including regular disseminations of press

releases on the national circuits of major newswire services and other wide-ranging

public disclosures, such as communications with the financial press and other similar

reporting services.

35.    As a result of the foregoing, the market for Riot securities promptly

digested current information regarding Riot from all publicly available sources and

reflected such information in Riot's stock price. Under these circumstances, all

purchasers of Riot securities during the Class Period suffered similar injury through

their purchase of Riot's securities at artificially inflated prices, and a presumption of

reliance applies.

36.    Alternatively, reliance need not be proven in this action because the

action involves omissions and deficient disclosures. Positive proof of reliance is not

a prerequisite to recovery pursuant to ruling of the United States Supreme Court in

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's investment strategies, intentions to hold the annual meeting, and the significant control of insiders to have affected their decisions as to whether to purchase and/or sell stock in Riot.

## <u>NO SAFE HARBOR</u>

37.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that

the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Riot who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

38.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Riot securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

39.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Riot securities was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Riot or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 14, 2016, Riot had 20,681,047 outstanding shares of

securities. Upon information and belief, these shares are held by thousands of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

40.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

41.    Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a)    whether the Exchange Act was violated by Defendants;

(b)    whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c)  whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)  whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e)  whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)  whether the price of Riot securities was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g)  whether the members of the Class have sustained damages as a result of the decline in value of Riot's securities when the truth was revealed, and if so, what is the appropriate measure of damages.

43.  Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

44.  Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

45.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of
### the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

46.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

47.    This Count is asserted by Plaintiff on behalf of themselves and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

48.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Riot's securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Riot's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

49.    Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's securities in an effort to maintain artificially high market prices for Riot's securities in violation of Section 10(b) of the Exchange Act and Rule 10-5.

50.     As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

51.     Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

52.    As a result of Defendants' fraudulent activity, the market price of Riot securities was artificially inflated during the Class Period.

53.    In ignorance of the true financial condition of Riot, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Riot containing the misleading information, purchased or otherwise acquired Riot's securities at artificially inflated prices during the Class Period.

54.    Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Riot's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased Riot's securities in reliance on the integrity of the market price of these securities, and Defendants manipulated the price of Riot's securities through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Riot.

55.    Throughout the Class Period, Defendants were aware of material non-public information concerning Riot fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the

Class's losses were the foreseeable consequence of Defendants' concealment of this information.

56.    As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Riot securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

57.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

58.    During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

59.   The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

60.   The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Riot's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being

concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of Riot's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

61.    The Individual Defendants acted as controlling persons of Riot within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Riot to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Riot and all of its employees. As alleged above, Riot is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

62.    As a direct and proximate result of the wrongful conduct of Riot and the Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

(A)    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and his counsel as Class counsel;

(B)    Awarding Plaintiff and the members of the Class damages, including interest;

(C)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees; and

(D)    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated:  April 18, 2018          **LEVI & KORSINSKY, LLP**

/s/ Donald J. Enright
Donald J. Enright
Elizabeth K. Tripodi (*pro hac vice to be submitted*)
John A. Carriel (*pro hac vice to be submitted*)
**LEVI & KORSINSKY, LLP**
1101 30th Street, N.W., Suite 115
Washington, D.C. 20007
Telephone: (202) 524-4292
Facsimile:  (202) 333-2121
Email: denright@zlk.com
Email: etripodi@zlk.com
Email: jcarriel@zlk.com

*Attorneys for Plaintiff Joseph J. Klapper, Jr.,*